# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

LONNIE SALAZAR,

        *Plaintiff,*

v.                                   CV 13-0414 KG/WPL

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

        *Defendants.*

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

Lonnie Salazar filed an application for Disability Insurance Benefits ("DIB") payments on March 2, 2009. (Administrative Record ("AR") 10, 151.)[1] He alleged that he had been disabled from February 2, 2009, due to anxiety, panic attacks, and paranoia. (AR 155.) Administrative Law Judge ("ALJ") Ben Willner held a hearing on his application on December 6, 2011. (AR 29.) He determined that Salazar was not under a disability as defined by the Social Security Act and therefore not entitled to benefits. (AR 22-23.) Salazar's application was denied. (*Id.*) Salazar requested review by the Appeals Council, but that request was denied, making the ALJ's decision the final decision of the Social Security Administration ("SSA"). (AR 1-3.)

Salazar sought a review of the SSA's decision and filed a motion to reverse and remand for rehearing (Doc. 18; *see also* Doc. 20 (memorandum)). The Acting Commissioner of the SSA ("Commissioner") responded (Doc. 21), and Salazar filed a reply (Doc. 22). Having read and carefully considered the entire record and the relevant law, I recommend that the Court grant Salazar's motion and remand this case to the SSA for proceedings consistent with this opinion.

---

[1] Although Salazar also filed for Supplemental Security Income payments (*see* AR 133-36), only the denial of his DIB application is at issue here (*see* AR 10).

## STANDARD OF REVIEW

In reviewing the ALJ's decision, the Court must determine whether that decision is supported by substantial evidence in the record and whether the correct legal standards were applied. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)). A decision is not based on substantial evidence if other evidence in the record overwhelms it or if there is only a scintilla of evidence supporting it. *Hamlin*, 365 F.3d at 1214 (quotation omitted). However, substantial evidence does not require a preponderance of evidence. *U.S. Cellular Tel. of Greater Tulsa, L.L.C. v. City of Broken Arrow, Okla.*, 340 F.3d 1122, 1133 (10th Cir. 2003). The Court must meticulously examine the record, but it may neither reweigh the evidence nor substitute its discretion for that of the Commissioner. *See Hamlin*, 365 F.3d at 1214 (quotation omitted). The Court may reverse and remand if the ALJ has failed "to apply the correct legal standards, or to show [it] that []he has done so." *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## SEQUENTIAL EVALUATION PROCESS

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); *Wall*, 561 F.3d at 1051-52; 20 C.F.R. § 404.1520 (2013). If a finding of disability or nondisability is directed at any point, the SSA will not proceed through the remaining steps. *Thomas*, 540 U.S. at 24. At the first three steps, the ALJ considers the claimant's current work activity and the severity of his impairment or combination of impairments. *See id.* at 24-25. If no finding is directed after the third step, the Commissioner must determine the claimant's residual functional capacity ("RFC"), or the most

that he is able to do despite his limitations. *See* 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1). At step four, the claimant must prove that, based on his RFC, he is unable to perform the work he has done in the past. *See Thomas*, 540 U.S. at 25. At the final step, the burden shifts to the Commissioner to determine whether, considering the claimant's vocational factors, he is capable of performing other jobs existing in significant numbers in the national economy. *See id.*; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

## Factual Background

Salazar, age forty-eight, is a high school graduate who has worked as a farmer and rancher, as a butcher, in lumber yards, and as a roofer. (AR 46-49.) He most recently worked as a soybean packer and forklift operator before being arrested in June 2004 after being accused of sexually assaulting his seventeen-year-old stepdaughter. (AR 49, 246, 249.) Following his conviction for sexual penetration of an adult, Salazar was imprisoned until February 2, 2009, which is also his potential disability onset date. (AR 10, 249.) Salazar's "date last insured"—that is, the date on which his DIB coverage lapsed—was June 30, 2009. (AR 10.)

On January 6, 2006, Salazar underwent a mental health examination for segregated inmates. (AR 252.) At the time, Salazar's appearance, attitude, speech, thought processes, mood and affect were all listed as normal, he reported no history of mental health treatment or psychotropic medication, and he was assigned a GAF score of seventy-five.[2] (*Id.*) Salazar was

---

[2] The GAF is "a hypothetical continuum of mental health-illness" assessed through consideration of psychological, social, and occupational functioning. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed., text rev. 2005). Although the fifth edition of the *DSM* dropped the GAF rating in 2013 in favor of an alternative assessment schedule, all of Salazar's relevant medical providers used this scoring method. A GAF score of seventy-one to eighty is assessed when the patient's symptoms include only "transient and expectable reactions to psychosocial stressors," with "no more than slight impairment in social, occupational, or school functioning." *Id.*

told at the time that he could request mental health services if needed. (*Id.*) A facility transfer form signed nineteen days later indicates no mental health issues (AR 260), and Salazar signed a form acknowledging that he was aware of the availability of mental health treatment at the facility and the method for obtaining it (AR 261).

Salazar participated in the Community Reintegration Unit ("CRU") program for sex offenders starting in January 2007. (AR 259.) It appears that Salazar was usually an active participant in CRU sessions and often presented with a stable mood and focused affect. (AR 253-55, 257-59.) The only anomaly occurred on April 17, 2007, when Salazar discussed difficulties his adult daughter and her children were having with her husband. (AR 256.) Although Salazar was agitated and "emotionally fragile" at the time, he remained focused, and he was later able to work with his counselor to file a report with the New Mexico Children Youth and Family Department. (*Id.*)

On August 31, 2007, Cecilia F. King, M.A., L.P.C.C., conducted an initial clinical assessment of Salazar. (AR 249-51.) Though Salazar reported no previous mental health treatment, he stated that he was in special education throughout high school and that he moved from grade to grade "without real instruction or really learning anything," and he claimed to have "problems with reading, spelling, math and all subject[s]." (AR 249-50.) Salazar was diagnosed with a history of sexual abuse of an adult, alcohol dependence, a history of polysubstance abuse, hypertension, and a GAF score of 70.[3] (AR 251.) Although King recommended continued participation in the CRU program (*id.*), the record does not contain documentation from any further CRU sessions.

---

[3] A GAF score between sixty-one and seventy is assessed when the patient is believed to have "[s]ome mild symptoms . . . OR some difficulty in social, occupational, or school functioning . . . but [is] generally functioning pretty well, [with] some meaningful interpersonal relationships." Am. Psychiatric Ass'n 34.

Salazar was released from prison on February 2, 2009 (AR 36-37), and he filed his Title II application for DIB payments exactly one month later (*see* AR 151). In the function report filled out by his daughter on his behalf, Salazar described waking up at 3:00 A.M. every morning and watching television until his wife wakes up, at which point he sometimes takes her to work before taking his medications and a nap. (AR 168.) When he wakes up, he eats and watches television until his wife gets home, and then he eats dinner and watches television until going to bed. (*Id.*) That said, Salazar claimed to spend half of every day doing common chores and yardwork, though he said he needs encouragement to do things because he feels people are watching him. (AR 170-71.) He reported no problems with personal care, though he claimed to need help remembering to take his medication, and he limits the food he prepares to sandwiches since he has forgotten how to cook. (AR 169-70.) Most days he only leaves the house to check the mail, and though he claimed not to drive because he does not know the city well, he reported shopping or going to the doctor twice a week "because she [his daughter] makes me" and stated that his wife or daughter drives him around. (AR 171-72.) Salazar claimed to struggle with comprehension, memory, concentration, following written instructions, and reading and writing in particular, and he said that he does not get along with family or friends because he was in prison for so long and they treat him like a child. (AR 173.) Salazar stated that he cannot handle his finances, noting that he has no savings account and that he does not know how to write a check or money order. (AR 171.)

Salazar's statements in his function report were largely echoed by his daughter, who completed a function report of her own. (*See* AR 176-83.) Unlike Salazar, she checked a box indicating that he does drive, although later on the same page she indicated that he does not drive because "[h]e can't pass [a] driving test." (AR 179.) She added that he "has his guard up like if

5

he was in prison" when people disagree with him, and she further stated that he is unable to sleep in the same room with his wife and gets "shaky . . . from being surrounded by strangers." (AR 183.)

On April 21, 2009, Salazar underwent a consultative examination by Finian J. Murphy, Ed.D., at the request of the SSA. (AR 266-67.) Salazar told Dr. Murphy that he decided to spend his full six-year sentence in prison[4] because parole conditions would have been too hard on him and his wife. (AR 267.) While there, he claimed, he developed a strong fear of people and was extremely frightened that other inmates would attack him, whether he was awake or asleep. (AR 266-67.) As such, Dr. Murphy reported that Salazar was now "extremely fearful of leaving his house" and "extremely fearful of other people." (AR 268.) Salazar stated that he now believes that his family and other people think ill of him, that his sleep every night is brief and fragmented, and that he feels exhausted and unmotivated during the day. (AR 267-68.) Although his emotional and mental status and his knowledge fund appeared to be normal in many respects, Salazar struggled with spelling, with series of numbers, and with interpreting idioms, and Dr. Murphy concluded that Salazar has low average intelligence. (AR 268-69.) Dr. Murphy assessed Salazar as having activities of daily living "within the normal range," moderate limitations in ability to understand instructions due to his reading and writing deficiencies, marked limitations in his ability to carry out instructions, and marked limitations in his ability to concentrate and persist at tasks. (AR 266.) Dr. Murphy diagnosed Salazar with generalized anxiety disorder with

---

[4] By contrast, Salazar's former attorney stated that Salazar served a seven-year sentence. (AR 246.) In fact, Salazar appears to have served under five years in prison, as he testified to being arrested in June 2004 (AR 49) and to being released in February 2009 (AR 37). Salazar's testimony is supported by his work history transcript, which shows work for two employers in 2004. (*See* AR 150.)

agoraphobia and with chronic and severe major depression, and he assigned a GAF score of thirty-five. (*Id.*)[5]

On April 28, 2009, non-examining consultative psychologist Donald Gucker, Ph.D., conducted a mental RFC assessment and psychiatric review technique after reviewing Salazar's function reports and records from Dr. Murphy and the Department of Corrections. (AR 272-89.) In his narrative report, Dr. Gucker cast doubt on elements of Dr. Murphy's assessment, commenting that Dr. Murphy offered no basis for his conclusions other than Salazar's own reporting. (AR 288.) He also noted that the record showed no current treatment or inpatient episodes, and although Salazar claimed in his function report that he did not drive, his daughter's function report stated that he drives a car.[6] (*Id.*) Finally, he saw no evidence of difficulty in the claimant-examiner relationship, and reports from the field office showed no problems other than nervousness. (*Id.*) He did, however, adopt Dr. Murphy's conclusions that Salazar suffers from chronic and severe major depression and generalized anxiety disorder with agoraphobia. (AR 276-85.)

Given these records and the remaining evidence in the record, Dr. Gucker concluded that Salazar could likely understand, remember, and carry out simple instructions; make simple decisions; attend and concentrate for two hours at a time; interact adequately with coworkers and supervisors; and respond appropriately to changes in routine work setting. (AR 288.) He found mild limitations on activities of daily living; moderate restrictions in maintaining social function;

---

[5] A GAF score of thirty-one to forty indicates "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." Am. Psychiatric Ass'n 34.

[6] Though Salazar did not check the box stating that he can drive (*see* AR 171), he did state in his function report that he sometimes takes his wife to work (*see* AR 168). Further, his daughter's function report said that Salazar both does and does not drive a car. (*See* AR 179.) Both function reports were completed by Salazar's daughter within a little over two weeks of each other. (*See* AR 175, 183.)

moderate restrictions in maintaining concentration, persistence, or pace; and insufficient evidence of any extended episodes of decompensation. (AR 286.)

In the mental RFC assessment, Dr. Gucker found that Salazar is moderately limited in his ability to understand and remember detailed instructions, but otherwise he is not significantly limited in his ability to understand and remember. (AR 272.) Regarding Salazar's ability to sustain concentration and persistence, Dr. Gucker assessed moderate limitations in most respects, though he found no limitation in the ability to carry out short and simple instructions or to make simple work-related decisions. (*Id.*) Dr. Gucker also found Salazar to be moderately limited in his ability to interact appropriately with the general public, to accept instructions and respond appropriately to supervisors' criticism, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; otherwise Dr. Gucker found no significant limitations in Salazar's ability to interact socially. (*Id.*) Finally, except for moderate limitations in Salazar's ability to set realistic goals or make plans independently of others, Dr. Gucker assessed no significant limitations in Salazar's ability to adapt. (*Id.*) The SSA reached an initial determination of nondisability that day. (AR 71.)

Salazar began receiving mental health treatment from Emory Moore, M.A., L.P.C.C., at the Family Workshop Counseling Center on May 24, 2009. (AR 306, 310.) In his initial assessment, Moore diagnosed Salazar as suffering from high blood pressure and an adjustment disorder with anxiety and depression, with a GAF score of forty, and he noted Salazar's statements that his prison time was "traumatic" and that he needs to retire to a "safe place" whenever touching or interaction becomes too intense. (AR 311, 314.) On August 14, 2009, at the apparent request of Salazar's attorney, Moore completed an "Assessment and Treatment Summary" after the sixth session with Salazar in which he added post-traumatic stress disorder

to the existing diagnosis. (AR 304-05; *see also* AR 306-07.) In that document, Moore noted Salazar's history of petty crimes and substance abuse, his functional illiteracy, his tumultuous family history, and the recent death of his brother. (AR 304.) Moore also commented that Salazar exhibited anxiety when discussing any activity involving social interactions and when speaking of his incarceration. (AR 305.)

In a Psychiatric Disability Statement completed on September 10, 2009, Moore assessed Salazar as having an organic mental disorder characterized by perceptual or thinking disturbances, personality changes, and mood disturbances. (AR 316-17, 323.) Moore also assessed a depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities, sleep disturbances, decreased energy, and feelings of guilt or worthlessness. (AR 319.) Finally, Moore assessed an anxiety disorder characterized by the following: a persistent irrational fear resulting in a compelling desire to avoid the object, activity, or situation triggering the fear; recurrent severe panic attacks; and recurrent and intrusive recollections of a traumatic experience. (AR 320.) He found that these conditions caused marked restrictions in Salazar's activities of daily living; extreme difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; and three episodes of extended decompensation. (AR 317; *see also* AR 320.)

Throughout his treatment with Moore, Salazar visited Presbyterian Healthcare Services to address several medical problems. (AR 290-94, 324-39.) On November 12, 2009, John Guttman, M.D., noted Salazar's complaints of anxiety and hypertension and adjusted Salazar's medications. (AR 327-29.) At an examination on December 15, 2009, Dr. Guttman observed that his earlier prescription of fluoxetine did not seem to help Salazar's anxiety and paranoia, which Salazar said caused him to want to stay home despite his weekly counseling sessions. (AR 324.)

Dr. Guttman also noted that Salazar now also complained that his right ankle hurt and locked up. (*Id.*) After x-raying the ankle and confirming Salazar's claim that he suffered from degenerative joint disease in that area, Dr. Guttman referred Salazar to a podiatrist. (AR 325.) Dr. Guttman also diagnosed Salazar with anxiety and hypertension, and he again adjusted Salazar's medications. (*Id.*)

In December 2009 and January 2010, Salazar was examined by Floyd L. Pacheco, Jr., D.P.M. (AR 340-42.) An MRI conducted in early January 2010 at Dr. Pacheco's instruction revealed a stage 1 osteochondral lesion at the medial corner of the talar dome and chronic sprains of the deltoid ligament, along with mild tarsi syndrome, mild brevis tendinosis, and mild tibial tendonosis. (AR 340, 343.) Dr. Pacheco recommended "solely utilizing conservative measures, ankle bracing, [and] steroid injection." (AR 340.) At an examination in late March 2010, Salazar claimed that he was exercising thirty minutes per day on a treadmill and walking outdoors for one hour per day. (AR 369.) Dr. Guttman assessed anxiety, uncontrolled hypertension, and obesity, and he asked Salazar to make an appointment for mental health treatment. (AR 370.)

In late January 2010, Salazar's attorney completed an updated function report on his behalf. (AR 202-09.) Though this document is largely consistent with the previous function reports, Salazar claimed in the report that he only does household chores three days per week, that he now only eats "plain" and "simple" meals, and that he only goes shopping with his wife every other week. (AR 204-05.) He also stated that he does drive, but "only to pick up [his] wife." (AR 205.) He mentioned that he wears a brace and received cortisone shots for his ankle, but when asked how far he can walk before needing to rest, he replied, "As needed." (AR 207-08.)

At Salazar's request, Moore sent a letter to the SSA on April 23, 2010, updating the agency on his treatment of Salazar. (AR 365.) In the letter, Moore states that he continues to treat Salazar for PTSD and that Salazar is making progress there. (*Id.*) Although less progress had been made on Salazar's anxiety, and in fact the anxiety had been exacerbated by a recent move and the loss of several family members, Moore was hopeful that the anxiety would resolve as treatment for Salazar's trauma moved forward. (*Id.*) However, Moore anticipated that full recovery would be "a very long term prospect." (*Id.*) Moore reiterated these points in a letter sent one month later, opining that it was "unlikely that [Salazar] will be able to hold a job in the foreseeable future" and that Salazar "should be eligible for disability on the basis of his mental health prognosis give[n] the severe level of impairment he has sustained." (AR 378.)

Salazar was examined by agency consulting physician Karl R. Moedl, M.D., on April 26, 2010. (AR 361.) With respect to Salazar's physical state, Dr. Moedl observed that although Salazar attributed pain in his ankle to time "standing on concrete in prison" and wore a splint, x-rays showed only "some degenerative changes and sprained ligaments." (*Id.*) He noted that Salazar "had no difficulty walking 18 miles on Easter to a shrine and church," that he could stand without difficulty, and that Salazar "can certainly work if he wanted to." (*Id.*) During the examination, Salazar could not squat or walk on his heels without hurting his ankles, but otherwise he could walk and travel without difficulty, he had normal stance and gait, and his strength and range of motion were good. (AR 362-63.) With respect to mental status, Salazar told Dr. Moedl that he gets anxious around police officers or other people "because he is afraid he will do something and have to go back to prison." (AR 361.) Dr. Moedl observed that Salazar was alert, he was oriented to time and place, and his cerebral function and sensory function were normal. (AR 363.) Dr. Moedl assessed Salazar with hypertension, anxiety with panic attacks, a

history of sexual predation, "[a]lleged paranoia," morbid obesity, "[a]lleged PTSD," and degenerative arthritis in his right ankle. (*Id.*)

On May 26, 2010, non-examining consulting physician David P. Green, M.D., completed an assessment of Salazar's alleged physical impairments. (AR 379.) Reviewing Salazar's function reports and the records from Dr. Guttman, Dr. Pacheco, and Dr. Moedl, Dr. Green opined that Salazar did not appear to suffer from "a severe physical impairment that poses any significant exertional or functional limitations." (*Id.*)

Elizabeth Chiang, M.D., another non-examining consulting physician, reconsidered the initial assessment of Salazar's alleged mental impairments on July 7, 2010. (AR 380.) After reviewing Moore's medical records and letters as well as Salazar's updated disability reports, Dr. Chiang concluded that the updated record was consistent with the initial assessment "and does not describe any significant change/decline in claimant's mental status/functioning. This man remains quite capable of unskilled work." (*Id.*) As such, the initial denial of DIB payments was affirmed. (*Id.*; *see also* AR 72.)

At an office visit in November 2011, Dr. Guttman added insomnia to Salazar's existing diagnoses of anxiety, obesity, "[o]ther testicular hypofunction," and an unspecified depressive disorder. (AR 388.) The following month, just before the ALJ's hearing, Moore sent a letter to Salazar's attorney reiterating his belief that Salazar's PTSD "makes it unlikely that he will be able to hold a job in the foreseeable future," and Moore again stated that Salazar should be eligible for disability due to his mental health prognosis. (AR 384.)

### HEARING TESTIMONY

On December 6, 2011, the ALJ held a hearing at which both Salazar and a vocational expert ("VE") testified via video. (AR 29.) Salazar was represented by an attorney. (*Id.*)

Describing his educational background, Salazar stated that he graduated high school but that he only took special education classes after the eighth grade. (AR 35-36, 42.) He said that he does not know how to read anything but little words and people's names, though he is sometimes able to order materials for his craft hobbies from magazines and catalogs using a money order or his wife's bank card. (AR 40-43.) Salazar also testified as to the nature of his past employment prior to his arrest. (AR 46-49.) With respect to household chores, Salazar testified that he washes dishes and clothes, sweeps and mops, vacuums, and cleans windows before his wife gets home. (AR 56.) He also repeated that he takes his wife to work in the mornings and that he usually picks her up at the end of the day. (AR 55-57.)

With respect to his alleged impairments, Salazar said that he continues to receive cortisone shots to treat the "arthritis" of his right ankle, a condition which he claimed causes his leg and ankle to lock up. (AR 44-45.) He acknowledged his doctor's suggestion to walk more often to address his obesity, but he said that he feels anxious when walking alone due to his status as a sex offender and his fear that someone might be behind him or watching him. (AR 34-35, 51-52.) Salazar testified that despite the medication he takes for his anxiety, he feels he has to keep his back against a wall when in public in order to feel safe. (AR 44.) He claimed that meeting a new person causes him to start shaking, sweating, and tensing up, and he said that he suffers from insomnia due to his constant thoughts about his personal troubles. (AR 58-59.) Salazar stated that his counseling sessions with Moore help him by allowing him to confront his problems with a familiar face and that Moore helps him decide "what needs to be done." (AR 57-58.)

The ALJ and Salazar's attorney next questioned the VE, Diane Weber, regarding Salazar's past work history and his future work ability. (AR 60-69.) Having reviewed Salazar's

past work, the ALJ first asked the VE if a hypothetical person could perform any work if he had no exertional limitations but was limited to understanding, remembering, and carrying out simple instructions; making simple decisions; interacting adequately with co-workers and supervisors; maintaining concentration, persistence, and pace at tasks for two hours at a time; and being able to respond to change in a routine work setting. (AR 64.)[7] The VE testified that this hypothetical person could work as a soybean packer, although he would be unable to operate a forklift in that position as Salazar had done in the past. (AR 64-67.) The ALJ then asked if such a hypothetical individual with Salazar's age, education, and work history could perform other jobs in the national economy, and the VE responded that this person could work as a hand packer, a cleaner in a hospital, a furniture rental clerk, or a routing clerk. (AR 67-68.) However, this hypothetical person would not be able to hold a job if he were to miss work three or more times per month on average. (AR 68-69.)

## THE ALJ AND APPEALS COUNCIL'S DECISIONS

The ALJ reviewed Salazar's claim pursuant to the five-step sequential evaluation process. (AR 11-12.) He first determined that Salazar had not engaged in substantial gainful activity between his alleged onset date of February 2, 2009, and his date last insured of June 30, 2009. (AR 12.) He then found at step two that Salazar suffered from two severe impairments, anxiety/affective disorders and obesity. (*Id.*) At this step, the ALJ also found that Salazar's hypertension and his degenerative joint disease of the right ankle did not cause more than minimal limitations and were therefore non-severe. (AR 13.) With respect to Salazar's hypertension, the ALJ observed that the impairment appeared to be under control with medication and had not resulted in any end organ damage. (*Id.*) As to Salazar's degenerative

---

[7] The ALJ did not limit this hypothetical individual to someone with Salazar's age, education, and work experience at this stage of questioning. (*See* AR 64.) Salazar does not argue that the ALJ erred in this respect.

joint disease, the ALJ reviewed Salazar's function reports and records from Dr. Guttman, Dr. Pacheco, Dr. Moedl, and the January 2010 MRI before concluding that the impairment was not causing any significant exertional or functional limitations. (AR 13-14.)

Moving to step three, the ALJ concluded that Salazar's impairments did not meet or medically equal an impairment listed in Appendix 1 of the SSA's regulations. (AR 14; *see also* 20 C.F.R. Part 404, subpt. P, app'x 1.) With respect to Salazar's mental impairments, the ALJ reviewed the "paragraph B" criteria in that Appendix and concluded that Salazar possessed only mild restrictions in activities of daily living; moderate restrictions in social functioning; moderate difficulties in concentration, persistence, or pace; and no extended episodes of decompensation. (AR 15.) He also determined that Salazar's hypertension was not of listing-level severity. (*Id.*)

In evaluating Salazar's RFC at the beginning of step four, the ALJ cited Salazar's hearing testimony and function reports as well as records from the Department of Corrections, Dr. Murphy, Moore, Dr. Guttman, Dr. Moedl, and Dr. Gucker. (AR 17-21.) After reviewing Dr. Murphy's opinions, the ALJ stated that he gave "less weight" to them; by contrast, the ALJ gave "great weight" to Dr. Gucker's opinions, "as they are well[-]reasoned, and more consistent with the greater weight of the credible evidence." (AR 20.) The ALJ also noted that he had not accepted Moore's opinions "as an acceptable medical source in determining whether the claimant has medically determinable impairments," but he said that he had considered and evaluated these opinions "along with all of the other evidence of record." (*Id.*) With respect to Salazar's severe impairment of obesity, the ALJ simply stated that he had "considered the effects of [Salazar]'s obesity and included those effects within the determination of [his] residual functional capacity." (AR 16.)

Based on his findings, the ALJ determined that Salazar possessed an RFC to perform a full range of work at all exertional levels, provided that he was limited to work involving only simple tasks, involving working primarily with things rather than people, requiring only limited reading and writing, and limited to concentration, persistence, and pace at tasks for two hours at a time. (AR 16.) In reaching this RFC, the ALJ found that Salazar's statements as to the intensity, persistence, and limiting effects of his symptoms were not credible to the extent that they were inconsistent with the RFC. (AR 17.)

Concluding his step four analysis, the ALJ determined that Salazar was unable to perform past relevant work based on this RFC. (AR 21.) However, moving to step five, the ALJ concluded that through his date last insured, Salazar had been able to perform other jobs that existed in significant numbers in the national economy, citing as examples the four positions mentioned by the VE at the hearing. (AR 21-22.) On that basis, the ALJ determined that Salazar was not disabled under the meaning of the Social Security Act between his alleged onset date and his date last insured, and Salazar was therefore not entitled to DIB payments for that period. (AR 22.) Although Salazar appealed this decision, the Appeals Council found that his reasons for disagreeing with the outcome did not justify a review of the ALJ's decision, thereby rendering the ALJ's decision the final decision of the Commissioner. (AR 1-3.)

### DISCUSSION

Salazar raises four challenges to the ALJ's decision to deny DIB payments. First, Salazar argues that the ALJ improperly considered Dr. Murphy's findings, which included limitations that the ALJ did not incorporate into his RFC. Next, he contends that the ALJ failed to properly weigh Moore's opinions, which were inconsistent with the ALJ's findings at steps three and four. Salazar also claims that the ALJ did not include the effects of obesity in the RFC and that the

ALJ could not rely on the VE's testimony at step five because his hypothetical questions to the VE were inconsistent with the RFC he ultimately adopted. However, because I find that the ALJ erred in his discussion of Dr. Murphy and Moore's opinions, I do not reach these final two claims of error.

## I.    Dr. Murphy's Opinion

Dr. Murphy completed a consultative examination at the SSA's request and found Salazar's activities of daily living to be within the normal range, moderate limitations in Salazar's ability to understand instructions, marked limitations in his ability to carry out instructions, marked limitations in his ability to concentrate and persist at tasks, and a GAF score of thirty-five. The ALJ assigned "less weight" to Dr. Murphy's opinions, citing expressly in the same paragraph to each of these findings except for that relating to Salazar's activities of daily living. He then accorded "great weight" to Dr. Gucker's opinions, reasoning that they were "well[-]reasoned, and more consistent with the greater weight of the credible evidence." Salazar argues that the ALJ's weighing of Dr. Murphy's opinion constitutes reversible error.

An ALJ must explain the weight he gives to the medical opinions he considers when, as here, he does not expressly grant controlling weight to a treating source opinion. *See* 20 C.F.R. § 1527(c). When deciding the weight to assign a medical opinion, the ALJ must consider factors such as (1) the examining relationship between the medical source and the claimant; (2) the treatment relationship between source and claimant; (3) the supportability of the source's findings; (4) the consistency of the source's opinion "with the record as a whole"; (5) the source's status as a specialist, if applicable; and (6) other factors that tend to support or contradict the opinion. *Id.* Though the ALJ does not need to expressly discuss each factor in evaluating opinion evidence, *see Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007), "the

record must reflect that the ALJ *considered* every factor in the weight calculation," *Andersen v. Astrue*, 319 F. App'x 712, 718 (10th Cir. 2009) (unpublished) (citations omitted). "The decision must articulate the ALJ's reasoning such that later reviewers can identify both the weight that was actually assigned to the opinion and the reasons for that weight." *Id.* (citing Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *5 (July 2, 1996)[8]).

Here, given the ALJ's perfunctory statement on the matter, it is not apparent that the ALJ appropriately considered the relevant factors when weighing Dr. Murphy's opinion. First, although the ALJ noted at different places in the opinion that Dr. Murphy examined Salazar (AR 17) while Dr. Gucker merely reviewed the evidence in Salazar's file (AR 19), he did not explain how or whether the examining relationship between these doctors and Salazar affected the weight he assigned to their opinions (*see* AR 20). This is important because opinions from examining sources are generally weighted above those from all other non-treating sources, whereas "the opinion of an agency [psychologist] who has never seen the claimant," such as Dr. Gucker, "is entitled to the least weight of all." *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).

Second, the ALJ did not appear to consider whether or to what extent Dr. Murphy's opinions were supported by evidence or reason.[9] The Commissioner disputes this conclusion, pointing out that elsewhere in his decision, the ALJ cited Dr. Gucker's statement that Dr. Murphy "offer[ed] no basis for his conclusions concerning the extent of [Salazar]'s limitation, other than the claimant's self report." (Doc. 21 at 7 (citing AR 19).) However, the ALJ gave no

---

[8] SSRs are binding on the SSA, and while they do not have the force of law, courts traditionally defer to SSRs since they constitute the agency's interpretation of its own regulations and foundational statutes. *See Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990); 20 C.F.R. § 402.35; *see also Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993) (SSRs entitled to deference).

[9] The ALJ's statement that Dr. Gucker's opinion was "well[-]reasoned" gives no indication as to how well-reasoned he considered Dr. Murphy's opinion to be.

indication that this statement from Dr. Gucker played any role in his weighing of Dr. Murphy's opinion, and "[t]he Commissioner's post hoc argument supplying possible reasons [for the ALJ's assignment of weight] is unavailing." *See Frantz v. Astrue*, 509 F.3d 1299, 1302 (10th Cir. 2007) (citing *Allen v. Barnhart*, 357 F.3d 1140, 1142, 1145 (10th Cir. 2004)). Moreover, "[t]he practice of psychology is necessarily dependent, at least in part, on a patient's subjective statements." *Thomas v. Barnhart*, 147 F. App'x 755, 759 (10th Cir. 2005) (unpublished) (citing *Robinson*, 366 F.3d at 1083). The ALJ could not have legitimately rejected Dr. Murphy's opinion solely on this basis, as to do so would "put the ALJ in the position of judging a medical professional on the assessment of medical data" and "impermissibly substitut[ing] [his] judgment for that of" Dr. Murphy. *See id.* at 759-60.

Next, the ALJ's statement that Dr. Gucker's opinions were "more consistent with the greater weight of the credible evidence" than Dr. Murphy's findings, though at least facially consistent with one factor listed in 20 C.F.R. § 404.1527(c), is flawed in several respects and is not supported by substantial evidence. Notably, the ALJ does not explain how Dr. Murphy's opinion was inconsistent with the record. Though the Commissioner provides a post hoc argument that "[t]he ALJ rejected Dr. Murphy's opinion based on [Salazar]'s daily activities," nowhere in his decision does the ALJ indicate that this is the case. On the contrary, Dr. Murphy's conclusion that Salazar's activities of daily living "are within the normal range" (AR 266) appears to be consistent with both Salazar's function report and the ALJ's assessment of that report.

Of course, the ALJ's failure to explain his reasoning outright is not necessarily an error that demands remand; the important thing is that the Court be able to follow his logic. *See Andersen*, 319 F. App'x at 718 (citations omitted). However, Dr. Murphy's opinion constituted

the only findings from an examining medical source regarding Salazar's alleged mental impairments during the period between his alleged onset date and his date last insured, and as such it is difficult to determine what other "credible evidence" the ALJ was considering in gauging that opinion. To be sure, the medical records from Salazar's incarceration period, dating at least seventeen months prior to his onset date, may have bearing on Salazar's impairment during that period. Yet "[p]articularly with regard to mental illness, an individual's level of functioning is not stable and consistent. Indeed, the functioning of an individual with a mental illness is expected to fluctuate over time." *See Vigil v. Astrue*, Civ. No. 11-cv-0158 WPL/RHS, Doc. 29 at *16 (D.N.M. Feb. 17, 2012) (unpublished) (citing Sarah E. Dunn, *Mental Block: The Challenges Awaiting a Mentally Impaired Claimant when Applying for Social Security Disability Benefits*, 22 REGENT U. L. REV. 453, 460-61 (2009-10)). If the ALJ meant to conclude that these older medical records constituted more "credible evidence" than Dr. Murphy's more recent examination records, he should have said so, and he should have explained why this was the case. Otherwise, his decision to reject Dr. Murphy's more recent examination findings without further explanation of his reasoning is "problematic" at best. *See id.*

For that matter, Dr. Murphy's findings appear to be consistent in some respects with the opinions from Moore, which I will examine in more detail shortly. Because I find that the ALJ committed reversible error in weighing the evidence from Moore, it is difficult to assess whether this consistency is of any consequence to the ALJ's weighing of Dr. Murphy's opinions. Still, it is enough at this point that the ALJ failed to show that he had considered all of the relevant factors or to fully articulate the reasons for assigning "less weight" to Dr. Murphy's findings. In this context, remand is appropriate.

I express no opinion as to what weight should be assigned to Dr. Murphy's opinion, as the application of the factors listed in 20 C.F.R. § 404.1527(c) is a matter reserved to the ALJ. However, I recommend that the Court remand with instructions that the ALJ make explicit his consideration of the relevant factors listed in that regulation and that he fully articulate both the weight he assigns and his reasons for reaching this determination. *See Andersen*, 319 F. App'x at 718 (citations omitted).

## II.     Moore's Opinions

Salazar's second claim of error is that the ALJ failed to properly weigh the evidence provided by Moore, his clinical counselor, who found several "marked" or "extreme" limitations relevant to a step-three determination (*see* AR 317) and who provided other opinions relevant to Salazar's RFC. Though the ALJ stated that he had "considered and evaluated" Moore's opinions, he determined that Moore was not an "acceptable medical source," a finding that Salazar does not appear to dispute, and he did not adopt Moore's assignment of "marked" or "extreme" limitations. Salazar argues that the ALJ was required to explain what weight he assigned to Moore's opinions pursuant to SSR 06-03p and relevant caselaw.

At the outset, I take note of the Commissioner's position that Moore's submission of documentation to the SSA at the behest of Salazar's attorney "creates the appearance that Plaintiff sought medical treatment in order to obtain disability benefits." The ALJ did not include this reasoning in his decision, and the Court may not "overstep [its] institutional role" by adopting the Commissioner's "post hoc effort to salvage the ALJ's decision." *See Allen*, 357 F.3d at 1142. As such, I will turn instead to the text of the decision itself to determine whether the ALJ properly weighed Moore's opinions.

Only evidence from "acceptable medical sources" can establish that a claimant suffers an impairment, *see* 20 C.F.R. § 404.1513(a), and only such sources can provide "medical opinions," *see id.* § 404.1527(a)(2). Further, only "acceptable medical sources" can be considered "treating sources" whose opinions are entitled to controlling weight. *Id.* §§ 404.1502, .1527(d). "The regulations, however, also contemplate the use of information from 'other sources,' both medical and non-medical." *Frantz*, 509 F.3d at 1301 (citing 20 C.F.R. §§ 404.1502, .1513(d)). In particular, therapists such as Moore are considered to be "[m]edical sources" or "other medical sources," and the evidence that they provide may be used to show the severity of a claimant's impairments and how they affect his ability to work. *See id.* (citing 20 C.F.R. § 1513(d)(1)). As the agency recognized in SSR 06-03p, "Opinions from these medical sources, who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." SSR 06-03p, 2006 WL 2329939, at *3 (Aug. 9, 2006).

As with acceptable medical source opinions, the weight of these other medical source opinions can be crucial to an ALJ's decision. SSR 06-03p instructs the ALJ to "explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." *Id.* at *6. In doing so, the ALJ is to use the same factors that apply to the weighing of acceptable medical source opinions as laid out in 20 C.F.R. § 404.1527(c). *See id.* at *2-3 (citation omitted). "The fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source' because . . . 'acceptable medical sources' 'are the most qualified health care professionals.'" *See id.* at *5 (quotation omitted).

Still, "depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source." *See id.*

The Tenth Circuit has previously remanded with instructions for the ALJ to explain the weight assigned to other medical sources when the ALJ blatantly ignores evidence from such sources that supports a finding of disability, *see Frantz*, 509 F.3d at 1302, and when the ALJ's evaluation of such evidence is "a close call" but remand is required on other issues, *see Bowman v. Astrue*, 511 F.3d 1270, 1275-76 (10th Cir. 2008). Still, the court has justified a more relaxed approach to the weighing of such opinions by pointing to SSR 06-03p's requirement that an ALJ's decision need only ensure that the reviewing court can "follow the adjudicator's reasoning," *see* 2006 WL 2329939, at *6. In *Keyes-Zachary v. Astrue*, for example, the Tenth Circuit refused to remand when the ALJ failed to explain the weight given to a therapist's GAF ranking that was lower than other GAF evidence in the record. *See* 695 F.3d 1156, 1163-65 (10th Cir. 2012). The court found no reversible error because "it [wa]s obvious that the ALJ gave little or no weight to [the therapist]'s GAF opinion. Simply put, had he assigned great weight to the low GAF score, he would not have developed the mental RFC for [the claimant] that he did." *See id.* at 1164. This holding was bolstered by the fact that the therapist's GAF ranking was notably lower than one assigned by an acceptable medical source during a consultative examination— after all, the examiner's status as an acceptable medical source was enough to justify assigning greater weight to his opinion. *See id.* at 1164-65 (citing SSR 06-03p, 2006 WL 2329939, at *5).

Here, as in *Keyes-Zachary*, the ALJ did not explain the weight assigned to Moore's opinions. However, unlike the opinions at issue in that case, several of Moore's findings were

consistent with those reached by the consultative examiner. For example, the GAF score of forty assigned by Moore does not significantly differ from the score of thirty-five assigned by Dr. Murphy, and both sources assessed marked difficulties in Salazar's ability to concentrate on or persist in tasks. Although the two sources differed in assessing Salazar's activities of daily living, Moore's finding of "extreme" limitations in Salazar's social functioning could arguably be seen as consistent with Dr. Murphy's report that Salazar avoids his family and is "extremely fearful" of other people and of leaving his house.

The consistency between some of Moore's opinions and Dr. Murphy's findings is critical here because the ALJ is required to consider the consistency of opinions from other medical sources "with the record as a whole" when assigning weight to those opinions. *See* SSR 06-03p, 2006 WL 2329939, at *2-3 (citation omitted). Moreover, although the ALJ discussed Moore's findings in some detail, he did not highlight any ways in which Moore's opinions were not supported by the evidence. *Cf. Krchmar v. Colvin*, --- F. App'x ---, 2013 WL 6334883, at *2 (10th Cir. Dec. 6, 2013) (unpublished) (finding no error in an ALJ's failure to discuss the weight assigned to an "other medical source" opinion that included a statement that the ALJ found "was not supported by any facts"); *Lundgren v. Colvin*, 512 F. App'x 875, 879-80 (10th Cir. 2013) (unpublished) (noting that the ALJ found a counselor's opinion to be "not substantiated by objective testing or even subjective interpretation" before implicitly assigning it little weight). In light of these facts, and given Moore's treating and examining relationship with Salazar, it does not suffice here, as it did in *Keyes-Zachary*, to simply state that the ALJ's contrary RFC demonstrates the weight assigned to this evidence. Because I find myself unable to "follow the adjudicator's reasoning" without a more explicit discussion of either the weight assigned to Moore's opinions or the factors used to reach this weight, remand is required.

Again, I express no opinion on whether Moore's findings are entitled to more or less weight than those from other sources; as always, that decision remains the province of the ALJ, guided by SSR 06-03p and the appropriate regulations. *See Bowman*, 511 F.3d at 1276. Nonetheless, it is notable that the ALJ appears to have disregarded the consistent opinions of two medical sources with the strongest examining and treating relationship with Salazar during the relevant period as being outside "the greater weight of the credible evidence," while simultaneously elevating the opinion of an agency psychologist who has never examined the claimant. Although these weighting decisions may be appropriate, the ALJ has a responsibility under the regulations and the relevant caselaw to first explain the weight assigned to these opinions and consider the appropriate factors when assigning this weight. Because the ALJ has failed to do so here, I recommend that the Court remand this matter to the SSA for further proceedings.

## CONCLUSION

The ALJ erred by failing to adequately explain his reasons for assigning "less weight" to Dr. Murphy's opinions regarding Salazar's alleged impairments. Further, the ALJ erred by failing to explain the weight assigned to Moore's opinions or to "otherwise ensure that the discussion of the evidence in [his] determination or decision allows [the Court] to follow the adjudicator's reasoning." *See* SSR 06-03p, 2006 WL 2329939, at *6. Because these errors require remand, I recommend that the Court grant Salazar's motion to reverse and that it remand this case to the SSA for proceedings consistent with these proposed findings.

> **THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the Proposed Findings and Recommended Disposition. If no objections are filed, no appellate review will be allowed.**

William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.